```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------x
OLA USTAD,

                    Plaintiff,

      -against-                                      **MEMORANDUM**
                                                     10–CV–3894 (FB) (RER)
INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, LOCAL 747; INTERNATIONAL
BROTHERHOOD OF TEAMSTERS; NORTH
AMERICAN AIRLINES; and GLOBAL
AVIATION HOLDINGS, INC.,

                    Defendants.
----------------------------------------------------x
```

*Appearances:*
*For the Plaintiff:*                      *For Defendants:*
ROBERT L. HERBST, ESQ.                    YVONNE L. BROWN, ESQ.
Herbst Law PLLC                           Spivak Lipton LLP
75 Howell Avenue                          1700 Broadway, 21st Floor
Larchmont, NY 10538                       New York, NY 10019

                                          EDWARD GLEASON, ESQ.
                                          Int'l Brotherhood of Teamsters
                                          25 Louisiana Avnue, NW
                                          Washington, DC 20001

**BLOCK, Senior District Judge:**

Plaintiff Ola Ustad ("Ustad") brings this action against defendants North American Airlines (the "Airline"), Global Aviation Holdings ("GAH"), International Brotherhood of Teamsters ("IBT"), and International Brotherhood of Teamsters Local 747 ("Local 747") (collectively, IBT and Local 747 will be the "Union"). He alleges that the Airline violated its collective bargaining agreement ("CBA") with the Union, and that the Union breached its duty to represent him fairly. On March 31, 2014, the Court issued an order granting summary judgment for the Union defendants and stated that this written opinion would follow.[1]

Ustad, a pilot, was terminated from his employment by the Airline, and contends that the Union attorney who represented him at his arbitration proceeding conducted an inadequate evidentiary investigation. He also argues that the Union failed to contact him in

---

[1] Claims against the Airline and GAH were administratively closed because of their filing of chapter 11 bankruptcy petitions. *See* Dkt. Nos. 43 and 82.

the first 24 hours after a flight incident to advise him to file a safety report that would have immunized him from his eventual discharge for violating safety regulations. Underlying Ustad's arguments is his belief that, because the Federal Aviation Administration ("FAA")—in a proceeding separate from the arbitration—found that he did not act intentionally, he was fired improperly by the Airline and that the Union is liable for not having represented him successfully.

In support of their summary judgment motion, the Union defendants argue that Ustad knew about the safety reporting procedure and had ample opportunity to file a report. They also argue that the Union attorney made tactical decisions that fall well short of a legally cognizable claim.

The Court has considered the parties' memoranda, reviewed the extensive record, and heard oral argument on the motion. For the reasons set forth below, summary judgment is granted for the Union defendants.

**I.**

The following undisputed facts are taken from the parties' Rule 56.1 statements and the record evidence.

Early on December 21, 2008, Ustad and his co-pilot, First Officer Rye Thompson ("Thompson"), took off from Pope Air Force base ("Pope") in North Carolina to JFK Airport in New York. Their takeoff deviated from a standard takeoff in many respects. Ustad operated the plane at a speed in excess of 250 knots while climbing from 2,000 to 9,000 feet; the nose of the aircraft was raised and lowered (i.e., the pitch fluctuated) atypically; and he retracted flaps at a low altitude. After takeoff, two Engine Indication Crew Alerting System ("EICAS") messages appeared, one related to flaps and the other related to slats. These events were captured by an Automated Flight Information Recording System ("AFIRS"). Nothing else unusual occurred for the remainder of the flight.

**1. Safety Incident Reports**

Shortly after landing, Thompson filed an Aviation Safety Action Program ("ASAP")

2

report with the Airline. The ASAP program—a joint agreement between the Airline, the FAA, and the Union—immunizes crew members who report safety incidents against disciplinary action and discharge, based on the events they report, other than for intentional behavior that places the aircraft at risk. The terms of the ASAP program make clear that it is the employee's responsibility to file a safety report. *See* Herron Decl., Ex. 1, Sec. 11(1) ("The employee must submit the report in accordance with the time limits specified.").

Thompson's ASAP report detailed his experience during takeoff and recorded the two EICAS warning messages. Thompson made no mention of external conditions that necessitated unusual takeoff maneuvers. In summing up, he reported:

> That is the best I can recall of that very fast abnormal takeoff. After calling Gear UP, SOPs were not performed and I did not know what the PF was doing. Essentially, I felt like a passenger. I could never have predicted the actions that took place in those first 20-30 seconds of flight.

Thompson ASAP Report, Gleason Decl., Ex. R, at 3.

The ASAP reporting program has different time limits for different types of reports. An Event Review Committee ("ERC") may designate a report as "sole-source" if it is one where "all evidence of the event available to the FAA is discovered by or otherwise predicated on the report." ASAP Program Mem. of Understanding, Herron Decl., Ex. 1, § 11.c. There is no time limit for sole-source reports, and "[i]t is possible to have more than one sole-source report for the same event" under the program's terms. *Id.*

Meanwhile, non-sole-source reports must be made within 24 hours of the end of the flight where a safety incident occurred, or within 24 hours of becoming aware of possible non-compliance with federal safety regulations. *See id.* at 11.b.(1)-(2). In the latter situation, for disciplinary immunity to apply, the ERC must determine that the crew member "did not know or could not have known about the possible noncompliance." *Id.*

Unlike Thompson, Ustad did not file an ASAP report. He also did not enter the flight irregularities in the maintenance log of the airplane at the end of the flight, although he was required to do so under the Airline's procedures. Instead, Ustad filed a separate report under

3

a different voluntary disclosure program administered by the National Aeronautics and Space Administration ("NASA").

The NASA Aviation Safety Reporting Program, like ASAP, offers disciplinary immunity for reporting safety violations that are not deliberate.[2] *See* Dep't. of Transp. FAA Advisory Circular 00-46D, 2, (discussing requirements for immunity under the NASA program). But unlike the ASAP program, the NASA program is not an agreement that involves the Airline; rather, its immunity protects against FAA actions (e.g., matters such as the agency's decision to "amend, modify, suspend, or revoke" a flight certificate, Gleason Decl., Ex. M.). Another difference is that the NASA program has a 10-day reporting limit in contrast to the ASAP program's 24-hour limit.

Ustad made his NASA report the day after the flight, on December 22, 2008, several hours after the ASAP 24-hour window had closed. Earlier that day he had received phone calls from the Airline and the Union. During the call from the Airline, Ustad was notified that there were reports of an event related to an aircraft he piloted, and that he would be placed on leave, with pay, while the Airline investigated the flight sequence. Ustad also spoke with Gene Sowell ("Sowell"), the Union general counsel, about the incident.

In his NASA report, Ustad noted that "the aircraft accelerated very quickly and therefore the speed might have been exceeded," and that "the EICAS display later on indicated a 'Status' message, and it mentioned something cryptic about both flaps and gear." Herron Decl., Ex. 5, at 2. Ustad also acknowledged, "I should have recorded in the Log those two Status messages, upon arrival at JFK, but instead told the maintenance crew entering the aircraft at JFK about them, and they indicated it was no problem." *Id.*

**2. Termination and Subsequent Proceedings**

On January 26, 2009, Ustad participated in an Investigatory Meeting, held by the

---

[2] Advisory Circular ("AC") 00-46D was replaced in 2011 by AC 00-46E, which made minor updates (e.g., making current the mailing address for reports). AC 00-46D was in effect when Ustad made his report in 2008.

4

Airline, which was summarized in a letter two days later. *See* Herron Decl., Ex. J. The letter explained that data collected from the flight recording system (the AFIRS data) showed non-standard flap retraction, excessive speed, and the EICAS messages. *See id.* At the meeting, Ustad acknowledged the excessive speed and his failure to make entries in the maintenance log. *See id.* The Airline terminated Ustad's employment on February 2, 2009, finding that he acted "willfully contrary to the best interest of safety, and did in fact violate several" company policies and procedures. *See* Gleason Decl., Ex. K.

After Ustad's termination, the Union followed the procedures afforded to discharged pilots under the collective bargaining agreement ("CBA"). First, the Union unsuccessfully appealed to an Airline hearing officer. Then the Union timely initiated an arbitration before the Airline's System Board of Adjustment (the "Board"). *See* Herbst Decl., Ex. 14, at 22-25. The Union assigned Patrick Flynn ("Flynn") as the attorney to represent Ustad in the forthcoming arbitration proceedings. Flynn had over 15 years of prior experience handling grievance arbitrations and FAA matters. The Union also assigned two representatives, John Herron ("Herron") and Duncan Parsons ("Parsons") to assist Flynn.

In early May, Flynn received a copy of a report from the FAA (the "FAA Notice"). The FAA had instituted a separate investigation, and as part of those proceedings, the FAA had performed an AFIRS data analysis, which it used to determine that Ustad had violated Federal Aviation Regulations in ways similar to Ustad's earlier admissions (i.e., excessive speed and failing to make maintenance log entries). *See* Gleason Decl. Ex. M ¶¶ 5-7, 13-14. The FAA Notice concluded that Ustad had operated the aircraft in a "careless and reckless manner." *Id.* ¶ 15.

After receiving the report, Flynn "talked to the FAA lawyer about the [AFIRS] data" and sent it to Ustad shortly after receiving it. Gleason Decl., Ex. B, at 54. He also spoke to Herron about the AFIRS data. *Id.* at 83, 85-97. As Flynn explained, ". . . it was our conclusion that, first of all, the data was not admissible." *Id.* at 92. "And second, if it was admitted, it couldn't be used to terminate Captain Ustad. And third, it was kind of [] a mixed bag. And

5

fourth, we weren't 100 percent sure at that time that the data was even reliable." *Id.* He concluded that, "based on all those factors, we didn't feel the need to seek out any expert or even attempt to use the data in the arbitration." *Id.* at 93.

At the arbitration hearing, which took place on August 26-27, 2009, Ustad testified as follows:

> Q: You are familiar with the ASAP program and its property, aren't you?
> A: I am.
>
> Q: You were involved in negotiating, weren't you?
> A: I was.
>
> Q: And there is a provision in the ASAP report that the ERC – you know what the ERC is, don't you?
> A: I do.
>
> Q: — if they get a report from one pilot that implicates another pilot, they have the opportunity to give the second pilot some additional time to file an ASAP report; correct?
> A: That's correct.
>
> Q: You do know all of this?
> A: I do know now, and I did then, yes.
>
> . . .
>
> Q: Sir, the reason you didn't file an ASAP report is for the reason I outlined in my opening statement: You understood, sir, did you not, that you only have immunity under an ASAP report if it's accepted by the ERC; you understood that, didn't you?
> A: That's correct.

Herron Decl., Ex. 2, 316-17. Ustad also testified that in addition to receiving the FAA Notice, he received the actual AFIRS data "a couple of weeks" before the arbitration. *Id.* at 310.

At the hearing, Flynn argued unsuccessfully that admitting the AFIRS data violated the CBA. Following the hearing, the parties submitted post-hearing briefs. *See* Herron Decl., Ex. 14 and 15. In the Union's brief, Flynn argued again that the AFIRS data should be excluded, that any irregularities in the takeoff were a result of Ustad having to perform an especially challenging sequence, and that NAA was "Out to Get Captain Ustad." *Id.* Ex. 14. Flynn also argued that, in any event, termination was too extreme in comparison to other cases of pilot misconduct.

The Board's decision, issued on March 2, 2010, upheld the Airline's termination. *See* Herron Decl., Ex. 16. It found that the Airline had just cause, credited Thompson, and provided extensive reasoning that analyzed and rejected Flynn's arguments. *See id.* A year later, in March 2011, the FAA issued a final report which concluded that Ustad operated the aircraft at an excessive speed in violation of Federal Aviation Regulations, but because it was unintentional his license would not be suspended. Gleason Decl., Ex. O.

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

A duty of fair representation claim is a hybrid claim, where a plaintiff must show "both (1) that [NAA] breached its collective bargaining agreement and (2) that [the Union] breached its duty of fair representation." *Sanozky v. Int'l Ass'n of Machinists & Aerospace Workers*, 415 F.3d 279, 282 (2d Cir. 2005). "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190 (1967).

**1. Flynn's Representation**

Ustad argues that Flynn's representation both before and during the arbitration proceedings was so inadequate that it constituted a breach of the duty of fair representation. Ustad contends that Flynn (1) ignored or inadequately investigated the AFIRS data, and (2) breached the duty of fair representation by making a decision to focus instead on excluding

7

the data entirely from the arbitration proceeding. While it is understandable that Ustad is frustrated that the Airline's determination that he acted intentionally was contradicted—two years later—by the final FAA report, the record does not show that the Union failed to represent him fairly.

First, there is no evidence that Flynn ignored or inadequately investigated the AFIRS data. Flynn received the FAA report and the agency's analysis of the data. *See* Gleason Decl., Ex. L. He considered the FAA's analytic conclusions, spoke to an FAA lawyer about the data, conferred with Herron, and made a decision not to call witnesses to challenge the data and instead to argue against its admission. It was a decision based on multiple factors, including his belief that the data was "a mixed bag." *Id.* Ex. B, at 92. Thus, the record belies Ustad's bald assertion that "[Flynn's] conclusion was irrational, unreasonable and arbitrary." Pl.'s 56.1 Stmt. ¶¶ 172-73. It is true that Flynn relied, in part, on the 2009 FAA report, which was eventually revised by the 2011 report that cleared Ustad of acting intentionally. But Flynn cannot be expected to have factored future reports into his decision process in the summer of 2009.

Nor on this record was Flynn's decision not to search for more evidence to undermine the AFIRS data "so egregious, so far short of minimum standards of fairness to the employee and [] so unrelated to legitimate union interests as to be arbitrary." *NLRB v. Local 282, et al.*, 740 F.2d 141, 147 (2d Cir. 1984). Instead, Ustad's criticism of Flynn's investigation amounts to "[a]llegations of mere negligent or unsuccessful representation," which cannot survive a motion for summary judgment. *Diem v. Central Suffolk Hosp.*, 234 F.3d 1261 (2d Cir. 2000) (citing *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372-373 (1990)).

Plaintiff's reliance on *Webb v. ABF Freight System*, 155 F.3d 1230 (10th Cir. 1998), is inapt. In *Webb*, the Union representative failed to review any evidence before the arbitration hearing, which the Tenth Circuit found to be a clear breach of the duty of fair representation. As mentioned, Flynn had the AFIRS data, reviewed its analysis, and spoke with various Union representatives before he made a strategic choice to focus on excluding, rather than

8

drawing attention to, what he believed was harmful and inadmissible evidence.

Such judgments are properly viewed as tactical. *See, e.g., Barr v. United Parcel Service, Inc.*, 868 F.2d 36, 43-44 (2d Cir. 1989) There, the Second Circuit explained that, "[a] union's good faith, non-arbitrary failure to take an action that is unlikely to be advantageous does not subject it to liability for breach of its duty of fair representation." *Id.* at 44. Its reasoning is apt here:

> Barr argues that Local 804 acted arbitrarily and in bad faith when it refused to present Barr's witnesses . . . and by failing both to prepare adequately for the meetings and the arbitration hearing and to have Pritchard represent Barr from the outset. While these decisions might conceivably have affected the outcome of the arbitration, they indubitably do not rise to the level of bad faith and arbitrariness. In hindsight, any decision a union makes in the informal yet complex process of handling its members' grievances may appear to the losing employee to have been erroneous. The decisions taken here by Local 804 were tactical in nature. At most, they may have been errors of judgment. In any event, they were not so egregious as to be evidence of bad faith and failure fairly to represent Barr.

*Id.* at 43. Ustad's arguments are similar, including his claim that Flynn's choice to pursue the data exclusion strategy led to a failure to call expert witnesses. Even if Ustad had called witnesses, it is only hypothetical speculation that the arbitration Board would have discredited the AFIRS data.

Finally, there is no genuine dispute about what the AFIRS evidence revealed or that the Board found that it was highly corroborative of Thompson's testimony. While Ustad offers a different *explanation* from that of Thompson about what led to the excessive speed, aircraft nose dips, and unusual wing flap behavior, he does not dispute the evidence itself.[3] Although his characterization of the nose dips was that they were not irregular, that is beside the point. The Board was well within its discretion to credit Thompson as it viewed the

---

[3]Plaintiff asserted both in his opposition memorandum and at oral argument that the flight data showed irregular activity because Ustad had to perform a difficult low-altitude level-off ("LALO") takeoff procedure that he "had never performed before, and on which all NAA pilots lacked training." Pl.'s Mem. Opp. S.J. But the record directly contradicts those representations: Ustad testified on direct examination at the arbitration hearing that he had been trained on the procedure in 2000 on a Boeing simulator, and that he had performed the procedure twice—and one of those times at Pope Air Force base, where the current incident occurred. *See* Herron Decl., Ex. 18.

9

AFIRS data as one part of the evidence as a whole.

Even viewing the facts in the light most favorable to Ustad, the party opposing summary judgment, *see Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), the Court concludes that Ustad has failed to show that any of Flynn's representation amounted to conduct that was "so egregious, so far short of minimum standards of fairness to the employee and [] so unrelated to legitimate union interests as to be arbitrary." *NLRB,* 740 F.2d at 147. Neither does the evidence support that Flynn's conduct was "arbitrary, discriminatory, or in bad faith." *Vaca,* 386 U.S. at 190.

**2. Ustad's Failure to File an ASAP Report**

Because Ustad was represented fairly throughout the arbitration proceeding, the Board's decision must stand, as well as its affirmation of the Airline's finding that Ustad acted "willfully contrary to the best interest of safety, and did in fact violate several" company policies and procedures. *See* Gleason Decl., Ex. K. This renders the issue of the ASAP Report irrelevant, because reporting intentional conduct provides no immunity.

Nevertheless, the Court will briefly address Ustad's claim that the Union breached its duty to represent him fairly by failing to advise him to make an ASAP report within 24 hours. The parties dispute what advice, if any, the Union gave to Ustad about filing an ASAP report and the circumstances of his failure to file one. However, the entire dispute is immaterial because, even if he had been found to have acted unintentionally, (1) Ustad was aware of the ASAP reporting requirements, (2) he was aware that a reportable incident had occurred, and (3) his first contact with the Union occurred after the 24-hour reporting period.

First, the record establishes that Ustad must have known of the ASAP policy, which makes it the responsibility of the employee to file a report. Ustad testified that he was familiar with the ASAP program, was involved in negotiating it, was familiar with the role of the ERC, and was knowledgeable about its timing requirements at a level of detail where he knew that the ERC could give a pilot additional time to file an ASAP report when another pilot had filed a report implicating him. *See* Herron Decl., Ex. 2, 316-17. Moreover, Ustad

was not minimally involved in negotiations. He spent four years as chair of the Union's negotiating committee for a period ending May 2008—only seven months before the event.

Ustad also was aware that a reportable incident had occurred. He asserts that, without the details of Thompson's ASAP report, he could not respond with his own, but there is no dispute that he piloted the flight at a speed that exceeded Federal Aviation Regulations—a fact confirmed even by the final 2011 FAA report. Ustad also acknowledged in his NASA report that, "I should have recorded in the Log those two Status messages," *id.* Ex. 5, 2, which was an admission of both his failure to make a required log entry and the existence of the EICAS warnings. All of these were reportable safety incidents that Ustad knew about the moment he landed at JFK.

Finally, there is no dispute that Ustad's first contact with the Union was more than 24 hours after the end of the flight; consequently, the Union could not have impacted his ability to make a report during the initial 24-hour window.

## CONCLUSION

For the reasons stated above, the Court granted the Union defendants' motion for summary judgment.

                                                            /s/ Frederic Block
                                                            FREDERIC BLOCK
                                                            Senior United States District Judge

Brooklyn, New York
April 1, 2014